# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

VALERIA TANCO and SOPHY JESTY, )
IJPE DeKOE and THOMAS KOSTURA, )
KELLIE MILLER and VANESSA )
DEVILLEZ, and JOHNO ESPEJO and )
MATTHEW MANSELL, )
                     )      **Case No. 3:13-cv-01159**
       **Plaintiffs,** )
                     )      **Judge Aleta A. Trauger**
**v.** )
                     )
HASLAM, *et al.,* )
                     )
      **Defendants.** )

---

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

---

Abby R. Rubenfeld (B.P.R. No. 6645)
RUBENFELD LAW OFFICE, PC
2409 Hillsboro Road, Suite 200
Nashville, Tennessee 37212

Maureen T. Holland (B.P.R. No. 15202)
HOLLAND AND ASSOCIATES, PLLC
1429 Madison Avenue
Memphis, Tennessee 38104-6314

Regina M. Lambert (B.P.R. No. 21567)
REGINA M. LAMBERT, ESQ.
7010 Stone Mill Drive
Knoxville, Tennessee 37919

William L. Harbison (B.P.R. No. 7012)
Phillip F. Cramer (B.P.R. No. 20697)
J. Scott Hickman (B.P.R. No. 17407)
John L. Farringer IV (B.P.R. 22783)
SHERRARD & ROE, PLC
150 3rd Avenue South, Suite 1100
Nashville, Tennessee 37201

Shannon P. Minter (CA Bar No. 168907)
Christopher F. Stoll (CA Bar No. 179046)
Asaf Orr (CA Bar No. 261650)
NATIONAL CENTER FOR
  LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 6

ARGUMENT ......................................................................................................... 10

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON
THE MERITS OF THEIR CONSTITUTIONAL CLAIMS ................................ 11

      A.     By Prohibiting Recognition of All Valid Marriages of
Same-Sex Couples, the Anti-Recognition Laws Create
an Unprecedented Categorical Exception to Tennessee's
General Rule that the State Will Recognize Marriages
Validly Entered into in Other Jurisdictions ............................................. 11

      B.     Tennessee's Anti-Recognition Laws Violate Due
Process Because they Impermissibly Deprive
Plaintiffs of a Protected Liberty Interest
in their Existing Marriages......................................................................... 14

            1.     Same-sex couples who legally marry in other
states and then move to Tennessee have a protected
liberty interest in their marriages .................................................... 16

            2.     Tennessee's Anti-Recognition Laws warrant
heightened constitutional scrutiny because they
disrupt existing marital relationships and also
warrant careful consideration as discriminations
of an unusual character .................................................................... 17

            3.     The Anti-Recognition Laws cannot survive
any level of constitutional scrutiny ................................................. 19

                  a.     The Anti-Recognition Laws impose a severe
burden and inflict severe harms on the
Plaintiffs and other married same-sex
couples and their families ................................................... 19

                  b.     Tennessee cannot provide a constitutionally
sufficient justification for the Anti-Recognition
Laws under any level of review ......................................... 23

C.      The Anti-Recognition Laws Impermissibly Infringe
        upon Plaintiffs' Exercise of their Constitutional Right to
        Interstate Travel .......................................................................................25

D.      The Anti-Recognition Laws Deny Plaintiffs Equal Protection
        of the Laws................................................................................................28

        1.      The Anti-Recognition Laws discriminate against
                the class of legally married same-sex couples and
                therefore are subject at least to the careful consideration
                applied by the Supreme Court in *Windsor* .....................................29

        2.      The Anti-Recognition Laws discriminate on the
                basis of sexual orientation and therefore are subject
                to heightened scrutiny ...................................................................30

        3.      The Anti-Recognition Laws discriminate on the
                basis of gender and therefore are subject to heightened
                scrutiny...........................................................................................33

        4.      Regardless of the applicable level of scrutiny,
                there is no constitutionally sufficient justification
                for the Anti-Recognition Laws' discrimination
                against married same-sex couples...................................................35

II.     PLAINTIFFS ARE SUFFERING AND WILL CONTINUE
        TO SUFFER IRREPARABLE HARM IN THE ABSENCE
        OF AN INJUNCTION ...........................................................................36

III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST
        FAVOR A PRELIMINARY INJUNCTION .........................................39

CONCLUSION...................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Attorney Gen. of New York v. Soto-Lopez*, 476 U.S. 898 (1986) ................................... 26

*Bond v. United States*, 131 S. Ct. 2355 (2011) ................................................................ 4

*Bonnell v. Lorenzo*, 241 F.3d 800 (6th Cir. 2001) ......................................................... 37

*Bowen v. Gilliard*, 483 U.S. 587 (1987) ........................................................................ 32

*Bowers v. Hardwick*, 478 U.S. 186 (1986) ..................................................................... 30

*Califano v. Westcott*, 443 U.S. 76 (1979) ...................................................................... 34

*Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*,
   363 F.3d 427 (6th Cir. 2004) ..................................................................................... 39

*City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985) ................................ 32

*Dean v. District of Columbia*, 653 A.2d 307 (D.C. 1995) .............................................. 32

*Deerfield Med. Ctr. v. City of Deerfield Beach,* 661 F.2d 328 (5th Cir. 1981) ............... 37

*Dunn v. Blumstein*, 405 U.S. 330 (1972) ....................................................................... 26

*Elrod v. Burns*, 427 U.S. 347 (1976) ............................................................................. 37

*Equality Found. of Greater Cincinnati, Inc. v. City of Cincinnati*,
   128 F.3d 289 (6th Cir. 1997) ..................................................................................... 30

*Farnham v. Farnham*, 323 S.W.3d 129 (Tenn. Ct. App. 2009) ........................... 2, 11, 13

*Frontiero v. Richardson*, 411 U.S. 677 (1973) .............................................................. 32

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071 (6th Cir. 1994) .......... 37, 39

*Garden State Equality v. Dow,* __ A.3d. __, 2013 WL 5687193 (N.J. Oct. 18, 2013) ................. 5

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ......................................................................... 40

*Golinski v. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968 (N.D. Cal. 2012) ..................... 32

*Griswold v. Connecticut,* 381 U.S. 479 (1965) ....................................................... 16, 18

*Hernandez-Montiel v. INS*, 225 F.3d 1084 (9th Cir. 2000) ............................................ 33

*In re Estate of Glover,* 882 S.W.2d 789 (Tenn Ct. App. 1994) ...................................... 13

*In re Lenherr's Estate*, 314 A.2d 255 (Pa. 1974) ........................................................... 12

*In re Levenson*, 560 F.3d 1145 (9th Cir. 2009) .............................................................. 33

*Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580 (6th Cir. 2008) ............................. 16

*Jones v. Hamilton Cnty Gov't, Tenn.,* No. 12-6079, 2013 WL 3766656
   (6th Cir. July 19, 2013) .............................................................................................. 11

*Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407 (Conn. 2008) ................................. 32

*Keith v. Pack,* 187 S.W.2d 618 (Tenn. 1945) ................................................................ 13

*Lawrence v. Texas,* 539 U.S. 558 (2003) ........................................................................ 23, 31, 38

*Lightsey v. Lightsey,* 407 S.W.2d 684 (Tenn. Ct. App. 1966) .................................................. 13

*Loving v. Virginia,* 388 U.S. 1 (1967) ............................................................................ 16, 17, 34

*Lyng v. Castillo,* 477 U.S. 635 (1986) ................................................................................. 32

*Madewell v. United States,* 84 F. Supp. 329 (E.D. Tenn. 1949) ................................................. 12

*Mass. Bd. of Ret. v. Murgia,* 427 U.S. 307 (1976) ............................................................. 31, 32

*Massachusetts v. United States Dep't of Health & Human Servs.,*
   682 F.3d 1 (1st Cir. 2012) ................................................................................................ 30

*Memorial Hosp. v. Maricopa Cnty.,* 415 U.S. 250 (1974) ................................................. 25, 27

*Miller v. Gammie,* 335 F.3d 889 (9th Cir. 2003) ...................................................................... 31

*Mississippi Univ. for Women v. Hogan,* 458 U.S. 718 (1982) .................................................. 35

*Montgomery v. Carr,* 101 F.3d 1117 (6th Cir. 1996) ................................................................ 18

*Newsom v. Norris,* 888 F.2d 371 (6th Cir. 1989) ..................................................................... 37

*Obama for Am. v. Husted,* 697 F.3d 423 (6th Cir. 2012) ......................................................... 11

*Obergefell v. Kasich,* No. 1:13-CV-501, 2013 WL 3814262
   (S.D. Ohio July 22, 2013) ............................................................................................. 5, 36

*Orr v. Orr,* 440 U.S. 268 (1979) ........................................................................................... 34

*Pennegar v. State,* 10 S.W. 305 (Tenn. 1889) .......................................................................... 2

*Perry v. Brown,* No. 10-16696 (9th Cir. June 28, 2013) (order dissolving stay) ........................... 5

*Perry v. Schwarzenegger,* 704 F.Supp.2d 921 (N.D. Cal. 2010) ......................................... 32, 33

*Planned Parenthood Ass'n of Cincinnati v. City of Cincinnati,*
   822 F.2d 1390 (6th Cir. 1987) ..................................................................................... 37, 39

*Plyler v. Doe,* 457 U.S. 202 (1985) ...................................................................................... 32

*Ramirez v. Webb,* 835 F.2d 1153 (6th Cir. 1987) .................................................................... 37

*Rhodes v. McAfee,* 457 S.W.2d 522 (Tenn. 1970) ............................................................... 13, 24

*Roberts v. United States Jaycees,* 468 U.S. 609 (1984) ........................................................... 16

*Romer v. Evans,* 517 U.S. 620 (1996) ......................................................................... 1, 18, 23

*Saenz v. Roe,* 526 U.S. 489 (1999) ................................................................................. 25, 27

*Scarbrough v. Morgan Cnty. Bd. of Educ.,* 470 F.3d 250 (6th Cir. 2006) ................................. 30

*Shapiro v. Thompson,* 394 U.S. 618 (1969) ................................................................. 25, 26, 27

*Shelby County v. Williams,* 510 S.W.2d 73 (Tenn. 1974) ......................................................... 12

*Sierra Club v. Korleski,* 681 F.3d 342 (6th Cir. 2012) .............................................................. 31

*State v. Bell,* 66 Tenn. 9 (1872) ........................................................................................... 14

*Stanton v. Stanton,* 421 U.S. 7 (1975) .................................................................................. 34

*Stemler v. City of Florence*, 126 F.3d 856 (6th Cir. 1997) ........................................................ 35

*Stenberg v. Cheker Oil Co.*, 573 F.2d 921 (6th Cir. 1978) ........................................................ 10

*Troxel v. Granville*, 530 U.S. 57 (2000) ........................................................ 16

*U.S. Department of Agriculture v. Moreno*, 413 U.S. 528 (1973) ........................................................ 35

*United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.,* 163 F.3d 341 (6th Cir. 1998) ........................................................ 11

*United States v. Virginia*, 518 U.S. 515 (1996) ........................................................ 28, 33

*United States v. Windsor*, 133 S.Ct. 2675 (2013) ........................................................ passim

*Varnum v. Brien*, 763 N.W.2d 862 (Iowa 2009) ........................................................ 32

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ........................................................ 16

*Watkins v. U.S. Army*, 875 F.2d 699 (9th Cir. 1989) ........................................................ 32

*Windsor v. United States*, 699 F.3d 169 (2d Cir. 2012) ........................................................ 30, 33

*Zablocki v. Redhail*, 434 U.S. 374 (1978) ........................................................ 17, 38

## Statutes and Regulations

1 U.S.C. § 7 ........................................................ 3

Tenn. Code Ann. § 7-51-1802 ........................................................ 33

Tenn. Code Ann. § 24-1-201 ........................................................ 7

Tenn. Code Ann. § 31-2-101 ........................................................ 7, 20, 21

Tenn. Code Ann. § 34-3-103 ........................................................ 7

Tenn. Code Ann. § 36-2-304 ........................................................ 8

Tenn. Code Ann. § 36-3-113 ........................................................ 1, 19

Tenn. Code Ann. § 39-15-101 ........................................................ 7

Tenn. Code Ann. § 50-6-210 ........................................................ 7

Tenn. Code Ann. § 66-1-109 ........................................................ 9

Tenn. Code Ann. § 67-8-315 ........................................................ 7

Tenn. Code Ann. § 8-27-207 ........................................................ 21

Tenn. Code Ann. § 68-3-305 ........................................................ 21

Tenn. Code Ann. § 68-3-306 ........................................................ 21

Tenn. Comp. R. & Regs. 1340-01-13-.12 ........................................................ 9

## Other Authorities

Joseph William Singer, *Same Sex Marriage, Full Faith and Credit, and the Evasion of Obligation*, 1 STAN. J. C.R. & C.L. 1, 40 (2009) ........................................................ 13

Lois A. Weithorn, *Can a Subsequent Change in Law Void a Marriage that Was Valid at Its Inception? Considering the Legal Effect of Proposition 8 on California's Existing Same-Sex Marriages,* 60 HASTINGS L.J. 1063, 1125 (2009) ........................................................................20

Steve Sanders, *The Constitutional Right to (Keep Your) Same-Sex Marriage,* 110 MICH. L. REV. 1421 (2012) ........................................................................ 12, 14

William M. Richman & William L. Reynolds, *Understanding Conflict of Laws* 398 (3d ed. 2002).................................................................................12

## Constitutional Provisions

Tenn. Const. Art. 11, Section 18............................................................................ 1, 19

## Briefs

Brief on the Merits for Respondent the Bipartisan Legal Advisory Group of the U.S. House of Representatives, *United States v. Windsor,* 133 S. Ct. 2675 (2013) (No. 12-307), 2013 WL 267026 ........................................................24

# INTRODUCTION

The Plaintiffs in this action are four married same-sex couples who, like thousands of other married couples in Tennessee, lived and married in other states before choosing to make Tennessee their home. As Plaintiffs have trusted, and as the U.S. Supreme Court has recently affirmed, the marriages that Plaintiffs entered into in other states share "equal dignity" with other couples' marriages and warrant the same protections that the federal Constitution ensures for all other marriages. *United States v. Windsor*, 133 S.Ct. 2675, 2693 (2013).

Tennessee law, however, "interfere[s] with the equal dignity" of Plaintiffs' marriages and the marriages of other same-sex couples living in Tennessee by refusing to recognize the marriages of same-sex couples who validly married in other states before moving to Tennessee. *Id*. Article 11, Section 18 of the Tennessee Constitution and Tennessee Code Annotated Section 36-3-113 (the "Anti-Recognition Laws") require the state and its officers to treat the marriages of Plaintiffs and other same-sex couples as though those marriages did not exist and to deny legally married same-sex couples all the protections, benefits, obligations, and security that Tennessee law provides for all other married couples, including those who have married elsewhere. For Plaintiffs, the price of moving to Tennessee was deprivation of their status as married couples and as family members under state law. The federal Constitution, however, permits no such price to be imposed on Plaintiffs or other same-sex couples who move to Tennessee after marrying under the laws of other states. "A State cannot so deem a class of [families] a stranger to its laws." *Romer v. Evans*, 517 U.S. 620, 635 (1996).

By this motion, Plaintiffs ask this Court to bar Defendants and those under their supervision from enforcing the Anti-Recognition Laws against the four Plaintiff couples in this case while this action is pending. Each day that Tennessee's unconstitutional Anti-Recognition

Laws remain in place and are enforced by Tennessee officials, they inflict severe and irreparable constitutional and practical harms on Plaintiffs and their children. Tennessee's non-recognition of Plaintiffs' otherwise valid marriages "touches many aspects of married and family life, from the mundane to the profound," and deprives Plaintiffs of critical protections that shield married couples and their children in times of need and vulnerability, as when illness, death, financial difficulties, or other misfortunes befall them. *Windsor*, 133 S.Ct. at 2694. Being excluded from such protections causes severe harm because the Plaintiffs must live daily with insecurity and must take steps to try to protect their families that no other married couples need take because of protections that Tennessee guarantees for all other married couples.

The challenged laws also harm Plaintiffs and their families by instructing state officials, the public, and even Plaintiffs' *own children* that Plaintiffs' marriages are unequal to other marriages and need not be respected. Such treatment "places same-sex couples in an unstable position of being in a second-tier marriage," "demeans the couple[s]," and "humiliates . . . children now being raised by same-sex couples." *Id.* Because Plaintiffs are likely to prevail in their constitutional challenges to the Anti-Recognition Laws, it is not tenable to require Plaintiffs and their young children—including a new baby who is expected in the spring—to continue suffering these severe harms during a potentially lengthy litigation process.

Tennessee's Anti-Recognition Laws are unprecedented enactments that create an exception to Tennessee's long-standing rule that "'a marriage valid where celebrated is valid everywhere.'" *Farnham v. Farnham*, 323 S.W.3d 129, 134 (Tenn. Ct. App. 2009) (quoting *Pennegar v. State,* 10 S.W. 305, 306 (Tenn. 1889)). Tennessee has created this unique exception for married same-sex couples not to achieve any important, or even legitimate, government objective, but simply to discriminate against married same-sex couples and subject their valid marriages to unequal treatment. In *United States v. Windsor*, the Supreme Court held that

Section 3 of the federal Defense of Marriage Act, 1 U.S.C. § 7 ("DOMA"), required "careful consideration" under the Constitution's due process and equal protection guarantees because it represented an "unusual deviation" from long-standing federal practice by categorically denying recognition to the lawful marriages of same-sex couples. 133 S.Ct. at 2693. The Supreme Court held that Section 3 could not survive this inquiry because "DOMA's principal effect is to identify a subset of state-sanctioned marriages and make them unequal," *id.* at 2694, and "no legitimate purpose overcomes the purpose and effect to disparage and to injure" married same-sex couples. *Id.* at 2696.

Like Section 3 of DOMA, Tennessee's Anti-Recognition Laws unjustifiably infringe upon Plaintiffs' constitutionally protected liberty interest in their existing marriages and therefore constitute "a deprivation of the liberty of the person" protected by due process. *Id.* at 2693. Similarly, the Anti-Recognition Laws deprive Plaintiffs of equal protection of the laws by discriminating against the class of legally married same-sex couples simply to express disapproval of that class. *See id.* at 2695-96. In addition to violating basic principles of due process and equal protection, the Anti-Recognition Laws also violate Plaintiffs' constitutional right to interstate travel. Tennessee has unconstitutionally conditioned Plaintiffs' ability to accept a job transfer, to pursue a new career opportunity, or even to be stationed in Tennessee as a member of the armed forces on giving up all the state-law protections, benefits, and responsibilities of their existing marriages and being relegated to the status of legal strangers to one another.

A conclusion by this Court that Plaintiffs are likely to prevail on their constitutional claims would in no way intrude upon Tennessee's traditional authority to determine which marriages from other jurisdictions to recognize. As an initial matter, "[s]tate laws . . . regulating marriage, of course, must respect the constitutional rights of persons," *Windsor*, 133 S. Ct. at

2691, and our constitutional tradition includes "the long-established precept that the incidents, benefits, and obligations of marriage are uniform for all married couples within each State." *Id.* at 2692. A state's exercise of its power to declare a couple married and so establish them as a family protected not only by state law, but also by the federal Constitution "confer[s] upon [the couple] a dignity and status of immense import." *Windsor*, 133 S.Ct. at 2692. In our federal system, in which interstate travel is ordinary, expected, and constitutionally protected, a state's power to marry couples within its borders is enhanced if the state can be confident that the state's conferral of marital status on couples will be respected by other states. A state's categorical exclusion of an entire class of marriages from other states without adequate justification therefore is an affront to our nation's federalism of a sort that has been rare in our constitutional tradition.

In considering the interplay of the rights of Plaintiffs, the power of the State of Tennessee, the authority of sister states, and the principles protected by the federal Constitution, it is important to bear in mind the purposes of federalism. The Supreme Court has emphasized that federalism does not just safeguard the various interests of the states and the federal government. Properly understood, "[f]ederalism [also] secures the freedom of the individual." *Bond v. United States*, 131 S. Ct. 2355, 2364 (2011). "By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power." *Id.* Tennessee's broad authority over the law of domestic relations does not include complete jurisdiction over Plaintiffs' marital status, which a sister state validly conferred and which the federal Constitution protects.

The relief this preliminary injunction motion seeks is limited. The motion requests only that this Court bar Defendants and those under their supervision from enforcing the Anti-Recognition Laws against the four Plaintiff couples in this case while this action is pending.

Because Plaintiffs are likely to succeed on the merits of their claims—and because prohibiting the state from continuing to enforce these laws (i) is necessary to prevent irreparable constitutional harm to Plaintiffs, (ii) would impose no material burden on Defendants, and (iii) would promote the public interest in safeguarding fundamental constitutional rights—this Court should preliminarily enjoin Defendants from enforcing the Anti-Recognition Laws to deny recognition to Plaintiffs' legal marriages while this lawsuit is pending.

This case is important—to Plaintiffs and to other same-sex couples in Tennessee—but, as one district court in this Circuit recently concluded in issuing a temporary restraining order enjoining state officials from refusing to recognize the valid out-of-state marriage of a same-sex couple, "[t]his is not a complicated case." *Obergefell v. Kasich*, No. 1:13-CV-501, 2013 WL 3814262, at *1 (S.D. Ohio July 22, 2013). Following the Supreme Court's ruling in *Windsor* just a few months ago, numerous courts around the country have recognized that the same immediate, severe constitutional harms imposed by Section 3 of DOMA also result from states' refusals to recognize the valid marriages of same-sex couples. Many of those courts have accordingly recognized the need for prompt constitutional relief. *See, e.g., Perry v. Brown*, No. 10-16696 (9th Cir. June 28, 2013) (order dissolving stay issued two days after announcement of *Windsor* decision, dissolving "effective immediately" previously issued stay of judgment invalidating California constitutional amendment providing that "[o]nly marriage between a man or a woman is valid or recognized in California"); *Obergefell*, 2013 WL 3814262, at *1 (issuing temporary restraining order requiring Ohio to recognize same-sex couple's marriage entered out of state); *Garden State Equality v. Dow,* __ A.3d. __, 2013 WL 5687193, at *7 (N.J. Oct. 18, 2013) (refusing to stay trial court order requiring New Jersey officials to administer marriage laws equally for same-sex couples). As more fully explained below, Plaintiffs request that this Court grant preliminary injunctive relief here.

## STATEMENT OF FACTS

Each of the Plaintiff couples entered into a valid marriage under the laws of other states before moving to Tennessee. Their circumstances are representative of the many personal and career situations in which families regularly find themselves, and which, in our mobile society, may cause married couples to relocate to a new state.

Plaintiffs Dr. Valeria Tanco and Dr. Sophy Jesty married in New York and subsequently moved to Knoxville, Tennessee, where both spouses accepted teaching positions at the University of Tennessee College of Veterinary Medicine. (Tanco & Jesty Decls. ¶¶ 4, 8.) Plaintiffs Army Reserve Sergeant First Class Ijpe DeKoe and Thomas Kostura married in New York while Mr. Kostura was residing in New York and Sgt. DeKoe was stationed at Fort Dix in New Jersey, preparing to be deployed to Afghanistan. (DeKoe & Kostura Decls. ¶ 4.) Following Sgt. DeKoe's return from Afghanistan, the couple moved to Memphis, Tennessee, where Sgt. DeKoe is now stationed. (*Id.* ¶ 8.) Plaintiffs Matthew Mansell and Johno Espejo married in California while residing there, (Mansell & Espejo Decls. ¶ 4), and moved with their children to Franklin, Tennessee, when Mr. Mansell's employer transferred many of its operations, including Mr. Mansell's position, from California to Nashville. (*Id.* ¶ 4.) Plaintiffs Kellie and Vanessa Miller-DeVillez married in New York while living in New Jersey, where their marriage was recognized. (K. Miller-DeVillez & V. Miller-DeVillez Decls. ¶ 4.) Later, they decided to return to Tennessee, where Kellie Miller-DeVillez had lived before moving to New Jersey. They bought a home in Greenbrier, and Kellie Miller-DeVillez returned to work for her former employer. (*Id.* ¶ 8.)

Before moving to Tennessee, each couple's marriage was recognized by their states of residence on an equal basis with all other marriages. In addition, since the Supreme Court's decision in *Windsor,* their marriages have been recognized by the federal government for many

purposes, including by Sgt. DeKoe's employer, the Army Reserves. Because of the Anti-Recognition Laws, however, the State of Tennessee treats their legal marriages as though they do not exist. (All Pltf. Decls. ¶ 9.)

Each of the Plaintiff couples has found themselves warmly welcomed by many Tennesseans, including their neighbors, colleagues, and employers. (All Pltf. Decls. ¶ 9.) But the State of Tennessee's refusal to respect their marriages strips them of a highly protected legal status, disrupts the expectations and plans they have made in reliance on being married, denies them all of the many legal protections, obligations, and benefits available to other married couples under Tennessee law, and jeopardizes their eligibility for some important federal protections, (All Pltf. Decls. ¶¶ 9-10), including Social Security benefits.[1] In order to create a measure of protection for their families and reduce the legal uncertainty created by Tennessee's refusal to respect their marriages, the Plaintiff couples would have to take potentially costly steps to prepare powers of attorney, wills, and other documents, but such steps cannot provide many of the protections that Tennessee law automatically grants to married opposite-sex couples. (All Pltf. Decls. ¶ 11.)[2]

---

[1]    The Social Security Administration recognizes the marriages of same-sex couples for purposes of benefits under the Social Security Act and is processing aged spouse benefits for these couples, provided that the couple resides in a state that respects the marriages of same-sex couples. Program Operations Manual System, GN 00210.100, *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0200210100. The Administration currently is holding spousal benefits claims filed by married same-sex couples living in states that do not respect their marriages and has not announced whether those benefits will be available to such couples. Program Operations Manual System, GN 00210.005, *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0200210005.

[2]    The terms "marriage" and "spouse" appear in hundreds of Tennessee statutes. To cite just a few examples, the many important protections and benefits available to married spouses under Tennessee law include: (1) the mutual duty of spouses to support each other financially, Tenn. Code Ann. § 39-15-101; (2) entitlement to priority in consideration for appointment as conservator for a spouse who is in need of a conservator, Tenn. Code Ann. § 34-3-103; (3) the evidentiary privilege for communications between spouses in both civil and criminal proceedings, Tenn. Code Ann. § 24-1-201; (4) an exemption from inheritance tax on property left to a spouse, which protects against economic distress or loss of a home when a spouse dies, Tenn. Code Ann. § 67-8-315(a)(6); (5) entitlement to inherit a deceased spouse's property through intestate succession, Tenn. Code Ann. § 31-2-101; and (6) the right to bring suit for damages if a spouse dies as a result of a work-related injury, Tenn. Code Ann. § 50-6-210.

For example, Dr. Tanco and Dr. Jesty are expecting a child in the spring of 2014. (Tanco & Jesty Decls. ¶ 15.) As the birth mother, Dr. Tanco will be recognized as the child's legal parent. Because of Tennessee's Anti-Recognition Laws, however, Dr. Jesty will not benefit from the statutory presumption that both spouses are the legal parents of a child born during a marriage (Tenn. Code Ann. § 36-2-304). (*Id*. ¶ 15.) Dr. Jesty and Dr. Tanco are concerned that their spousal relationship will not be recognized, and that Dr. Jesty will be unable to make medical decisions for the child, especially if Dr. Tanco experiences any difficulties during the birth. (*Id*. ¶ 17.) Additionally, in preparation for their child's arrival, the couple attempted to enroll on a single health insurance plan that would cover their entire family. (*Id*. ¶ 18.) But because their employer is a state entity and participates in the State of Tennessee's group health insurance plan, their request for enrollment on a family plan as a married couple was denied because the state does not recognize the validity of their marriage. (*Id*. ¶ 19.)

Because of their job situations, Plaintiffs Kellie and Vanessa Miller-DeVillez have been maintaining a long-distance marriage for the time being, with Vanessa Miller-DeVillez returning home to Tennessee every few weeks. (V. Miller-DeVillez Decl. ¶ 21.) As a result, they have the security of knowing that their marriage would be respected if a crisis or emergency were to arise while they are in New Jersey; as soon as they return to Tennessee, however, they lose this peace of mind. (*Id.*) The couple is also concerned that if Vanessa Miller-DeVillez should lose her current employer-provided health insurance, she will be unable to obtain health insurance coverage from Kellie Miller-DeVillez's employer, a benefit extended to opposite-sex married couples. (*Id.* ¶ 22.)

In addition, Kellie and Vanessa Miller-DeVillez decided to legally take each other's names when they married, as many couples do, and used the hyphenated name "Miller-DeVillez" on their marriage certificate. (K. Miller-DeVillez & V. Miller-DeVillez Decls. ¶ 4.)

After moving to Tennessee, the couple went to the Driver Services Center in Springfield, Tennessee, to obtain Tennessee driver's licenses reflecting their married names. (*Id.* ¶ 19.) *See* Tenn. Comp. R. & Regs. 1340-01-13-.12 (allowing spouses to obtain driver's license reflecting married name by presenting original or certified copy of marriage certificate). Upon presenting the necessary documentation, they were told that, unlike other married couples, they could not use their marriage certificate to change their names on their driver's licenses because the State of Tennessee does not recognize the marriages of same-sex couples. (*Id.* ¶ 20.) The State of Tennessee has therefore denied them even the basic dignity of being called by the family name they validly adopted by marrying.

Tennessee's Anti-Recognition Laws also prevent Plaintiffs from having the security of knowing that they own their marital homes together as tenants by the entirety, a form of ownership available only to married couples. Tenn. Code Ann. § 66-1-109. This form of tenancy provides important legal protections against the possibility of a forced sale to collect on a debt and allows property to pass automatically from one spouse to the other upon death free of any inheritance taxes. Dr. Tanco and Dr. Jesty, and Kellie and Vanessa Miller-DeVillez have recorded deeds stating that they are holding title to their respective homes as tenants by the entirety, (Tanco & Jesty Decls. ¶ 23; K. Miller-DeVillez & V. Miller-DeVillez Decls ¶ 17); however, Tennessee's Anti-Recognition Laws prevent Plaintiffs from holding title in this manner, and as long as those laws remain in effect, Plaintiffs have no security that the deeds they have recorded would be honored by state agencies and courts. Plaintiffs likewise have no security that if either spouse were to die, the surviving spouse would be able to inherit the marital home without paying an inheritance tax, since Tennessee's Anti-Recognition Laws exclude them from that protection.

Beyond the many legal protections that are denied to the Plaintiff couples, the refusal by Tennessee and its officials to recognize their legal marriages serves as a continuing reminder to Plaintiffs and other Tennesseans that the state regards Plaintiffs and their families as second-class citizens whose marriages are to be disregarded by every state official they may encounter as though those marriages had never existed. (All Pltf. Decls. ¶¶ 12-14.) Unlike opposite-sex couples who have the security of knowing that their marriage will be universally respected, Tennessee's constitutional and statutory denial of recognition means that whatever recognition Plaintiffs' marriages may receive is due only to the goodwill of individual Tennesseans, and could be withdrawn at any time without recourse under state law. (*Id.*)

## ARGUMENT

"The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978). Defendants have now filed an Answer in which they do not identify any substantive factual dispute but make plain their intention to enforce the Anti-Recognition Laws. Indeed, Defendants refuse to recognize that Plaintiffs even have a constitutionally protected interest in their marriages. *See* Answer ¶ 3 ("Defendants deny . . . that Plaintiffs possess a liberty and property interest in their marriages or relationships under the Due Process clause of the 14th Amendment to the United States Constitution"). As shown below, without a preliminary injunction, Plaintiffs and their families will suffer serious harms that could never be remedied after the conclusion of this lawsuit.

In considering whether Plaintiffs are entitled to a preliminary injunction, the Court must consider the following four factors: (1) whether Plaintiffs are likely to succeed on the merits, (2) whether they are likely to suffer irreparable harm in the absence of preliminary relief, (3) whether the balance of equities tips in their favor, and (4) whether an injunction is in the

public interest. *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.* (*"United Food")*, 163 F.3d 341, 348 (6th Cir. 1998). "'These factors are not prerequisites to issuing an injunction but factors to be balanced.'" *Jones v. Hamilton Cnty Gov't, Tenn.,* No. 12-6079, 2013 WL 3766656 (6th Cir. July 19, 2013) (quoting *United Food*, 163 F.3d at 347). When, as here, "a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.'" *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)). All four of the relevant factors favor the issuance of a preliminary injunction here.

# I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CONSTITUTIONAL CLAIMS.

Plaintiffs are likely to succeed on the merits of their constitutional claims for at least three reasons. First, the Anti-Recognition Laws violate due process because they impermissibly deprive Plaintiffs of a protected liberty interest in their existing marriages. Second, the Anti-Recognition Laws impermissibly infringe upon Plaintiffs' exercise of their constitutional right to interstate travel. Third, the Anti-Recognition Laws deny plaintiffs equal protection of the laws. These three grounds, any one of which is sufficient to support issuance of the preliminary injunctive relief sought, are addressed in turn after detailing how the Anti-Recognition Laws create an unprecedented categorical exception to Tennessee's general rule that the state will recognize marriages validly entered into in other jurisdictions.

## A. By Prohibiting Recognition of All Valid Marriages of Same-Sex Couples, the Anti-Recognition Laws Create an Unprecedented Categorical Exception to Tennessee's General Rule that the State Will Recognize Marriages Validly Entered into in Other Jurisdictions.

Tennessee courts have long applied the rule that "a marriage valid where celebrated is valid everywhere." *Farnham*, 323 S.W.3d at 134 (quoting *Pennegar,* 10 S.W. at 306 (Tenn.

1889)). The place of celebration rule "is recognized in every state, and thus it has become a defining feature and basic incident of American marriage." Steve Sanders, *The Constitutional Right to (Keep Your) Same-Sex Marriage,* 110 MICH. L. REV. 1421, 1434 (2012). The rule "recognizes that individuals order their lives based on their marital status and 'need to know reliably and certainly, and at once, whether they are married or not.'" *Id.* (quoting Luther L. McDougal III et al., *American Conflicts Law* 713 (5th ed. 2001)). This near-universal rule of marriage recognition "confirms the parties' expectations, . . . provides stability in an area where stability (because of children and property) is very important, and . . . avoids the potentially hideous problems that would arise if the legality of a marriage varied from state to state." William M. Richman & William L. Reynolds, *Understanding Conflict of Laws* 398 (3d ed. 2002). As one federal district court judge in Tennessee described it, the "policy of the civilized world[] is to sustain marriages, not to upset them." *Madewell v. United States*, 84 F. Supp. 329, 332 (E.D. Tenn. 1949) (holding that Tennessee courts would recognize a common-law marriage validly formed in Alabama even though Tennessee does not permit common-law marriage within the state); *see also In re Lenherr's Estate*, 314 A.2d 255, 258 (Pa. 1974) ("In an age of widespread travel and ease of mobility, it would create inordinate confusion and defy the reasonable expectations of citizens whose marriage is valid in one state to hold that marriage invalid elsewhere.").

For well over a century, Tennessee courts have, almost without exception, held that marriages validly entered into in other jurisdictions will be honored in Tennessee—even if the couple would not have satisfied the statutory requirements to obtain a license to marry in Tennessee. For example, Tennessee has recognized: (1) common-law marriages entered into in another state and valid under the law of that state, even though common-law marriages are not recognized if entered into in Tennessee, *Shelby County v. Williams,* 510 S.W.2d 73, 74 (Tenn.

1974); *In re Estate of Glover,* 882 S.W.2d 789, 789-90 (Tenn Ct. App. 1994); *Lightsey v. Lightsey,* 407 S.W.2d 684, 690 (Tenn. Ct. App. 1966); (2) marriages validly entered into in another state by parties who do not satisfy the minimum age requirements to marry under Tennessee law, *Keith v. Pack,* 187 S.W.2d 618, 619 (Tenn. 1945); and (3) marriages validly entered into under the law of another state that are technically bigamous and would have been void and contrary to public policy if entered into in Tennessee, *Farnham*, 323 S.W.3d at 140.

The sole exception to this established rule has been for marriages that violate such strong principles of Tennessee public policy that the parties to the relationship would be subject to criminal prosecution. Only in such circumstances have Tennessee courts concluded that marriages lawfully contracted in another state should be denied recognition. *See, e.g, Rhodes v. McAfee,* 457 S.W.2d 522, 524 (Tenn. 1970) (holding that an out-of-state marriage between a stepfather and a stepdaughter following the stepfather's divorce from the mother was void where such marriage could be prosecuted as a felony in Tennessee). And although Tennessee courts from time to time have invoked public policy to withhold recognition from particular marriages that so offended public policy as to violate criminal prohibitions, Tennessee never previously enacted a measure that categorically denied recognition to an entire class of marriages.[3]

Against this background, the Anti-Recognition Laws represent an unprecedented departure from the general rule followed throughout the country and from Tennessee's own past treatment of out-of-state marriages. The Anti-Recognition Laws were enacted in 1996 and 2006 as part of a national wave of statutes and state constitutional amendments aimed at preventing same-sex couples from marrying. Never before had Tennessee enacted an express category-

---

[3]  Reliance by courts on the public policy exception to deny recognition to out-of-state marriages historically has been extremely rare in Tennessee and elsewhere. Indeed, "until the recent hysteria associated with same sex marriage, the public policy exception was fast becoming obsolete." Joseph William Singer, *Same Sex Marriage, Full Faith and Credit, and the Evasion of Obligation*, 1 STAN. J. C.R. & C.L. 1, 40 (2009).

based statutory exception to the place of celebration rule—an exception that applies to an entire class of couples, and only to that class. Never before had Tennessee enshrined such an exception *in the state constitution itself.*[4]

Indeed "[o]nly with same-sex marriages have states imposed emphatic and inflexible rules of nonrecognition." Sanders, *supra,* at 1438. Opposite-sex couples who enter into marriages that are valid under the law of their state of residence at the time of the marriage can ordinarily expect that they will be able to move anywhere in the country, including Tennessee, without the slightest concern about whether their new home state will respect their marriage. Tennessee's Anti-Recognition Laws, however, deny married same-sex couples—and only those couples—the security and predictability of this rule when they move to or consider moving to Tennessee. The Supreme Court has repeatedly and recently emphasized that "[d]iscriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitution[ ]." *Windsor*, 133 S. Ct. at 2692 (citations and internal quotation marks omitted). Tennessee's Anti-Recognition Laws constitute just such "discriminations of an unusual character."

> **B.    Tennessee's Anti-Recognition Laws Violate Due Process Because they Impermissibly Deprive Plaintiffs of a Protected Liberty Interest in their Existing Marriages.**

In *Windsor*, the Supreme Court held that same-sex spouses who have entered into valid marriages have a constitutionally protected interest in their marital status and that the categorical refusal of the federal government to recognize the valid marriages of same-sex couples was "unconstitutional as a deprivation of the liberty of the person protected by the Fifth Amendment

---

[4]      Although Tennessee never enacted a statute or constitutional provision expressly barring recognition of interracial marriages from other states, as opposed to provisions barring entry into such marriages in Tennessee, the Tennessee Supreme Court did effectively preclude recognition of out-of-state interracial marriages by upholding the criminal prosecution of a white man for cohabiting with his African-American wife despite their valid marriage in Mississippi. *State v. Bell,* 66 Tenn. 9, 10 (1872).

of the Constitution." *Windsor,* 133 S. Ct. at 2695. Like Section 3 of DOMA, which the Supreme Court struck down in *Windsor,* Tennessee's Anti-Recognition Laws treat the valid marriages of same-sex couples as if they did not exist, denying those marriages recognition for all purposes under state law, just as DOMA did under federal law. As with DOMA, the injury that the Anti-Recognition Laws inflict on legally married same-sex couples "is a deprivation of an essential part of the liberty protected by the [Constitution's due process guarantee]." *Id.* at 2692.[5]

Tennessee's refusal to recognize Plaintiffs' valid marriages from other jurisdictions violates the Fourteenth Amendment's due process guarantee for numerous reasons, including the same reasons that the Supreme Court relied upon in concluding that Section 3 of DOMA violated the Fifth Amendment's due process guarantee. As with Section 3 of DOMA, Tennessee law's "unusual deviation from the usual tradition of recognizing and accepting state definitions of marriage here operates to deprive same-sex couples of the benefits and responsibilities that come with" legal recognition of their marriage. *Id.* at 2693. Tennessee's refusal to recognize Plaintiffs' marriages constitutes an extraordinary disruption of their lives and severely infringes upon their protected interests in the comprehensive set of protections and responsibilities afforded by marriage, which cannot be fully replicated by other means. As explained below, the resulting negative impact on Plaintiffs' stability, security, and dignity is as severe as that caused by federal non-recognition in *Windsor,* exposing their families to an alarming array of legal vulnerabilities and harms, "from the mundane to the profound." *Id.* at 2694. As with DOMA, because the purpose and effect of Tennessee's Anti-Recognition Laws are precisely to achieve that unequal treatment by excluding "persons who are in a lawful same-sex marriage" from the

---

[5]        The Fifth Amendment's Due Process Clause provides protection against deprivations of liberty and property by the federal government without due process of law, and the Fourteenth Amendment's Due Process Clause provides protection against such deprivations by state governments.

same protections given to other married persons, those laws violate the Constitution's due process guarantee. *Id.*

### 1. Same-sex couples who legally marry in other states and then move to Tennessee have a protected liberty interest in their marriages.

*Windsor* held that same-sex spouses have a protected liberty interest in their marriages and that deprivation of this interest without adequate justification violates due process. *See* 133 S. Ct. at 2695. The Court's ruling in *Windsor* is consistent with cases stretching back for decades in which the Supreme Court has held that spousal relationships, like parent-child relationships, are among those intimate family bonds whose "preservation" must be afforded "a substantial measure of sanctuary from unjustified interference by the State." *Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984); *see also Loving v. Virginia*, 388 U.S. 1, 12 (1967) (reversing married interracial couple's convictions for violations of anti-miscegenation statutes); *Griswold v. Connecticut,* 381 U.S. 479, 485-86 (1965) (holding marriage is "a relationship lying within the zone of privacy created by several fundamental constitutional guarantees"); *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997) (recognizing "marital privacy" as a fundamental liberty interest). The Supreme Court's cases protecting family relationships have explained that the Due Process Clause "guarantees more than fair process"; it "also includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (internal quotation marks and citations omitted); *see also Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 590 (6th Cir. 2008).

Plaintiffs have the same protected liberty interest in their marital relationships as did the plaintiffs in *Windsor, Loving, Griswold,* and other cases involving attempts by the government to interfere with the relationships of married couples. Like the plaintiff in *Windsor*, the Plaintiffs in

this case are already legally married. Accordingly, the issue presented here is not whether these Plaintiffs have a constitutional right to enter into a marriage in Tennessee,[6] but rather whether Tennessee can effectively deprive them of an existing marital status by treating their legal marriages as nullities. Under the reasoning in *Windsor,* the government's non-recognition of same-sex couples' valid marriages deprives them of a protected liberty interest. As explained below, Tennessee cannot justify such a deprivation here.

### 2. Tennessee's Anti-Recognition Laws warrant heightened constitutional scrutiny because they disrupt existing marital relationships and also warrant careful consideration as discriminations of an unusual character.

Because Tennessee's Anti-Recognition Laws deprive Plaintiffs of their constitutionally protected liberty interest in their existing marriages, those laws, and their application to Plaintiffs, cannot stand unless they survive heightened scrutiny. In addition, at a more basic level, because the Anti-Recognition Laws constitute "'discriminations of an unusual character,'" they cannot stand unless they can survive the "careful consideration" that such discriminatory laws warrant. *Windsor*, 133 S. Ct. at 2692 (internal quotation marks and citations omitted).

The Anti-Recognition laws warrant heightened scrutiny because there is no basis to distinguish between same-sex and opposite-sex married couples in defining their liberty interest

---

[6]     A person's protected interest in an existing marital relationship is distinct from a person's fundamental right to marry in the first instance. *See, e.g., Zablocki v. Redhail*, 434 U.S. 374, 397 n.1 (1978) (Powell, J., concurring in the judgment) (noting difference between "a sphere of privacy or autonomy surrounding an existing marital relationship into which the State may not lightly intrude" and "regulation of the conditions of entry into . . . the marital bond"). The right to marry, which is also grounded in due process, protects an individual's interest in deciding whether and whom to marry without undue government interference. Without addressing whether same-sex couples have a fundamental right to marry, *Windsor* held that once a same-sex couple enters into a legal marriage under state law, the spouses have the same fundamental liberty interest in the continuing existence and recognition of their marriage as other married couples. This motion does not require the Court to decide whether state laws barring same-sex couples from marrying infringe upon Plaintiffs' fundamental right to marry the person of their choice. *See, e.g., Loving v. Virginia*, 388 U.S. 1 (1967). Although Plaintiffs contend that the Constitution does require that states grant same-sex couples the freedom to marry, and that the Anti-Recognition Laws unconstitutionally burden Plaintiffs' previous decisions to exercise that fundamental right by marrying in other states, *see* Complaint ¶¶ 102-108, the Court need not reach that issue to grant the preliminary relief requested in this motion.

in their existing marriages lawfully entered in other jurisdictions, as the Supreme Court recognized in *Windsor. See id*. at 2693 (discussing "the equal dignity of same-sex marriages, a dignity conferred by the States in the exercise of their sovereign power") (emphasis added). In addition, as explained below in the next subsection, the Anti-Recognition Laws disrupt Plaintiffs' marriages in significantly harmful ways. When a law imposes a "direct and substantial" burden on an existing marital relationship, the law cannot be upheld "unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." *Montgomery v. Carr*, 101 F.3d 1117, 1124 (6th Cir. 1996) (internal quotation marks and citation omitted); *see also Griswold*, 381 U.S. at 485-86 (applying heightened constitutional scrutiny in striking down law barring use of contraceptives by married couples).

In *Windsor*, the Supreme Court had no need to reach the question whether Section 3 of DOMA could survive heightened scrutiny because the Court concluded that Section 3 violated due process in a more basic way, because it could not survive even the level of "'careful consideration'" that "'discriminations of an unusual character'" warrant. *Windsor*, 133 S. Ct. at 2692 (quoting *Romer v. Evans*, 517 U.S. 620, 633 (1996)). The Court concluded in *Windsor* that DOMA's deviation from the traditional rule of federal recognition of valid state marriages and its "avowed purpose" of ensuring that legally married same-sex couples were denied the federal benefits and protections provided to all other married persons were "strong evidence of a law having the purpose and effect of disapproval of that class." *Id*.

As previously explained, Tennessee's Anti-Recognition Laws similarly represent a radical departure from Tennessee's past adherence to the place-of-celebration rule. In addition, the Anti-Recognition Laws have the same "avowed purpose and practical effect" as Section 3 of DOMA: to impose a disadvantage, a separate status, and a stigma on married same-sex couples by denying them all of the benefits and responsibilities that otherwise would follow from

18

Tennessee's recognition of the valid marriages of couples who marry in other states. That purpose is apparent on the face of the laws themselves, which render "void and unenforceable" any marriages between same-sex couples that are legally entered into in other states. Tenn. Const. Art. 11, § 18; Tenn. Code Ann. § 36-3-113. As the Supreme Court found with respect to Section 3 of DOMA, this purpose of denying equal recognition to married same-sex couples is not "an incidental effect" of Tennessee's law, but "its essence." *Id.* at 2693. Like DOMA, Tennessee's Anti-Recognition Laws were enacted "to ensure that if any State decides to recognize same-sex marriages, those unions will be treated as second-class marriages." *Id.* at 2693-94. Like DOMA, their "principal effect is to identify a subset of state-sanctioned marriage and make them unequal," and their "principal purpose is to impose inequality." *Id.* at 2694. For these reasons, this Court should subject Tennessee's Anti-Recognition Laws, at the very least, to the "careful consideration" to which the Supreme Court subjected Section 3 of DOMA.

> ### 3. The Anti-Recognition Laws cannot survive any level of constitutional scrutiny.
>
> #### a. The Anti-Recognition Laws impose a severe burden and inflict severe harms on the Plaintiffs and other married same-sex couples and their families.

In a manner virtually unprecedented in this country's history (outside the context of anti-miscegenation laws that have long since been held unconstitutional), Tennessee's Anti-Recognition Laws cause serious harms to families and society by disregarding the longstanding, deeply rooted, and otherwise near-universal rule that a marriage that is validly entered by a couple living in one state will be recognized when the couple travels or relocates to another state. By excluding legally married same-sex couples from this uniform rule, Tennessee has created an untenable and chaotic situation whereby Plaintiffs are legally married in the states where they wed; legally married in the many other states and countries that recognize the marriages of same-

sex couples who marry in other jurisdictions; and legally married for purposes of most federal protections and responsibilities. But so long as they reside in Tennessee, Plaintiffs' legal marriages are deemed to be "void and unenforceable" under the laws of this state. The instability and harm caused to Plaintiffs and others by this extraordinary deprivation are significant, continuing, and cumulative. "[N]ullification of a valid marriage when both partners wish to remain legally married constitutes the most extreme form of state interference imaginable in the marital relationship." Lois A. Weithorn, *Can a Subsequent Change in Law Void a Marriage that Was Valid at Its Inception? Considering the Legal Effect of Proposition 8 on California's Existing Same-Sex Marriages,* 60 HASTINGS L.J. 1063, 1125 (2009).

Marriage provides the only means under Tennessee law whereby two adults can establish a family unit that must be legally respected by the state and by others. Through hundreds of statutes, regulations, and common-law rules, Tennessee's laws provide married couples with comprehensive protections and responsibilities that enable them to make a legally binding commitment to one another and to any children they may have, and to be treated as a legal family. While some of these protections may be approximated by private agreements, most cannot. Virtually all other couples who legally marry in another state and then move to Tennessee, including couples who could not have married under Tennessee's own laws, are treated as married in Tennessee, and automatically obtain all of the same protections and responsibilities as other married couples in Tennessee. For the entire class of married same-sex couples, however, and only for those couples, Tennessee's Anti-Recognition Laws create a statutory and constitutional barrier that excludes married same-sex couples who move to this state from this network of legal protections and responsibilities. In effect, the state strips them of their marital status and of all the marital protections and obligations they had enjoyed before moving to Tennessee.

Tennessee's Anti-Recognition Laws deprive married same-sex couples of a host of protections, from the right of a spouse to inherit property through intestate succession, Tenn. Code Ann. § 31-2-101, to the eligibility of a widow or widower to obtain state-subsidized health insurance if their spouse dies in the line of duty in the Tennessee Army National Guard or the Tennessee Air National Guard, Tenn. Code Ann. § 8-27-207. These state-law protections range "from the mundane to the profound," *id.,* but many are designed to assist families in their times of greatest need and to protect them when misfortune strikes unexpectedly. For example, Plaintiffs Dr. Valeria Tanco and Dr. Sophy Jesty are expecting a child in early 2014. If their marriage were recognized by Tennessee, Dr. Jesty would be recognized as a parent of the child and would have authority to make medical decisions for the child should any problems arise during or after birth. *See* Tenn. Code Ann. §§ 68-3-305, -306. Because of the Anti-Recognition Laws, however, only Dr. Tanco will be treated as a legal parent at the time the child is born, and Dr. Jesty has no assurance that her authority to direct the medical care of their child will be respected.

Moreover, Tennessee's refusal to recognize Plaintiffs' marriages may limit the federal marital protections available to Plaintiffs. The federal government has not yet determined whether certain federal benefits and protections will accrue to legally married same-sex couples who live in states that do not recognize their marriages. As a result of the Anti-Recognition Laws, Plaintiffs experience current injury—including uncertainty regarding their legal relationship to each other and their children, as well as uncertainty regarding their finances and their rights in the event of illness, incapacity, death, or divorce. In addition to excluding Plaintiffs from the hundreds of tangible rights, benefits, and protections that are provided to other legally married couples in Tennessee and jeopardizing their eligibility for certain federal protections, Tennessee's Anti-Recognition Laws also injure Plaintiffs and their families by

stripping them of the legal and social "recognition, dignity, and protection" that marriage provides. *Windsor*, 133 U.S. at 2693.

Marriage is more than the sum of the concrete legal rights and obligations it provides, as important as those are. It is also recognized within our constitutional tradition and society as a highly protected and respected family "status of immense import." *Id.* at 2681. Marriage conveys the depth and seriousness of a couple's commitment to one another and instructs others to respect the couple's privacy, dignity, and autonomy and the integrity of their family relationship. When a person tells someone that he or she is married, that statement conveys a web of shared meanings and expectations that enable the couple to be treated and interact with others as a family and protects the family's privacy and integrity. These intangible protections are especially important for children, who benefit from the stability and social support that marriage provides. *Id.* at 2694 (explaining that federal government's non-recognition of same sex couples marriages under DOMA "humiliates tens of thousands of children now being raised by same-sex couples" and "makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives").

Like the federal DOMA, Tennessee's Anti-Recognition Laws "tell[] [Plaintiffs], and all the world, that their otherwise valid marriages are unworthy of . . . recognition. This places same-sex couples in an unstable position of being in a second-tier marriage." *Id.* The Anti-Recognition Laws also harm Plaintiffs' children by instructing them that the State of Tennessee regards their parents' marriages and their families as less worthy of recognition than other marriages and families—indeed, that they are worthy of no recognition at all. Like DOMA, the Anti-Recognition Laws "instruct[] all [state] officials, and indeed all persons with whom same-

sex couples interact, including their own children, that their marriage is less worthy than the marriages of others." *Id.* at 2696.

In sum, married same-sex couples who relocate to Tennessee—or who even visit, travel to, or pass through the state—suffer the constant indignity and practical hardship of knowing that the government treats them as legal strangers—two legally unrelated individuals—rather than a family, that the law instructs others to treat them in that way as well, and that they are unable to fully care for and protect one another or their children.

**b. Tennessee cannot provide a constitutionally sufficient justification for the Anti-Recognition Laws under any level of review.**

The purported government interests that were offered in support of DOMA's denial of federal benefits to married same-sex couples are equally insufficient to support Tennessee's categorical denial of state-law protections here, even under rational basis review. Appeals to history and tradition cannot justify the harms the Anti-Recognition Laws inflict on Plaintiffs, because tradition is not a legitimate reason to deny equal treatment to same-sex couples and relationships. *See Lawrence v. Texas,* 539 U.S. 558, 571 (2003) (striking down laws criminalizing same-sex sexual intimacy even though "for centuries there have been powerful voices to condemn homosexual conduct as immoral"). Likewise, moral disapproval of same-sex couples and relationships is never a legitimate constitutional justification for legislation. *Windsor,* 133 S. Ct. at 2695; *Lawrence,* 539 U.S. at 571; *Romer,* 517 U.S.at 634-35. Nor can the Anti-Recognition Laws be justified by arguing that the state's refusal to recognize the marriages of same-sex couples will promote procreation by opposite-sex couples, or that married opposite-sex couples make better parents than married same-sex couples. Not only are these assertions completely unfounded, but they also have no rational or logical application to existing marriages or to children who are already being raised by legally married same-sex couples. Moreover, the

same justifications were also presented to the Supreme Court in support of DOMA, *see* Brief on the Merits for Respondent the Bipartisan Legal Advisory Group of the U.S. House of Representatives at 28-49, *United States v. Windsor,* 133 S. Ct. 2675 (2013) (No. 12-307), 2013 WL 267026, at *28-*49, and the Court found none of them sufficient to overcome the constitutional harm of denying government recognition to the otherwise valid marriages of same-sex couples. *See Windsor,* 133 S. Ct at 2696.

Because Tennessee cannot offer a constitutionally sufficient justification for the serious harms inflicted by the Anti-Recognition Laws, Tennessee cannot permissibly exclude Plaintiffs' lawful marriages from its general rule of marriage recognition, nor can it strip Plaintiffs of an existing marital status simply because they have moved to Tennessee from another state.[7] Tennessee's Anti-Recognition Laws unconstitutionally deprive Plaintiffs of their liberty interest in their existing marriages for the same reasons that DOMA's denial of federal benefits to married same-sex couples deprived them of the liberty protected by the Due Process Clause. As with DOMA, the class to which the Anti-Recognition Laws "direct[] [their] restrictions and restraints" are legally married same-sex couples. *Id.* at 2695. As with DOMA, the "principal purpose" of Tennessee's enactment of the Anti-Recognition Laws is "to impose inequality, not for other reasons like governmental efficiency." *Id.* at 2694. And as with DOMA, the effect of the Anti-Recognition Laws is to deprive legally married same-sex couples of the full range of legal protections, benefits, and obligations that are available to other married couples in Tennessee. The Due Process Clause cannot tolerate such an unjustified deprivation of fundamental liberties.

---

[7]     Of course, this does not mean that Tennessee would be obliged to recognize marriages from other jurisdictions where it had a compelling or sufficiently important reason to withhold recognition, such as to protect vulnerable persons. *See, e.g., Rhodes,* 457 S.W.2d at 524.

## C. The Anti-Recognition Laws Impermissibly Infringe upon Plaintiffs' Exercise of their Constitutional Right to Interstate Travel.

The "*virtually unconditional* personal right, guaranteed by the Constitution to us all,*" *Saenz v. Roe*, 526 U.S. 489, 499 (1999) (emphasis added and quotation marks omitted), to "be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement," *id.* at 498 (internal quotation marks omitted)—including the freedom "to migrate, resettle, find a new job, and start a new life," as Plaintiffs have done in this case, *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969)—"has repeatedly been recognized as a basic constitutional freedom."[8] *Memorial Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 254 (1974). It is a right "firmly embedded in" our country's jurisprudence," and one which is essential to our federal system of government, whereby each "citizen of the United States has a perfect constitutional right to go to and reside in any State he chooses, and to claim citizenship therein." *Saenz*, 526 U.S. at 498, 503-04 (quotation marks omitted).

The fundamental right to interstate travel is among those basic aspects of our federal system that enables the United States truly to be *one indivisible nation*. The ability to experience the United States as a single nation is currently being denied to many thousands of legally married same-sex couples, including Plaintiffs. The rapid enactment in the 1990s and the first decade of this century of discriminatory laws such as Tennessee's Anti-Recognition Laws have created a constitutionally intolerable situation for married same-sex couples in this country. Because of laws such as Tennessee's, there are today *two Americas* for married same-sex couples—a group of states where it is safe for them to travel with their families and a second

---

[8]     As the Court explained in *Shapiro*, there is no "particular constitutional provision" that serves as the source for the right to travel. 394 U.S. at 630. The Supreme Court has identified, for instance, the Privileges and Immunities Clause of Art. IV, section 2, the Privileges or Immunities Clause of the Fourteenth Amendment, the Commerce Clause, and the Due Process Clause of the Fifth Amendment depending on the circumstances of a particular case. *Id.* at 630 n. 8.

group of states, including Tennessee, where it is not safe for them to travel if they expect to be seen and protected as a family.[9]  The basic constitutional right to interstate travel is rendered largely meaningless for families such as Plaintiffs' families if states may condition residency on the absolute loss of marital status and the myriad of legal protections and obligations that such status guarantees.

"A state law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when," as here, "it uses any classification which serves to penalize the exercise of that right." *Soto-Lopez*, 476 U.S. at 903 (internal quotation marks and citations omitted).  As explained above in Section I.B., Tennessee's statutory scheme severely penalizes Plaintiffs' migration to the state by nullifying their constitutionally protected marital status for state-law purposes.  It is difficult to imagine many penalties that are as severe as the penalty that Tennessee law visits upon married same-sex couples—the penalty of having their marriage nullified, with the requirement that they stand in the eyes of the law as strangers to each other without access to the hundreds of legal protections that Tennessee offers to other married couples and their children.  All of Plaintiffs entered into valid marriages in other states before moving to Tennessee.  Three of the Plaintiff couples moved to Tennessee for jobs, including a veteran of the war in Afghanistan now stationed at an Army base in Memphis.  Because Plaintiffs are completely shut out of the important protections that Tennessee guarantees to other married couples, Plaintiffs have been required to surrender their right to be protected as a family as a penalty for moving to Tennessee.

---

[9]  It is inevitable that Tennessee's discriminatory marriage recognition laws "actually deter[] travel." *Attorney Gen. of New York v. Soto-Lopez*, 476 U.S. 898, 903 (1986)).  Plaintiffs, however, do not have to show that they were themselves deterred from moving to the state. *Maricopa County*, 415 U.S. at 258; *Dunn v. Blumstein*, 405 U.S. 330, 339-40 (1972) ("*Shapiro* did not rest upon a finding that denial of welfare actually deterred travel.  Nor have other 'right to travel' cases in this Court always relied on the presence of actual deterrence.").  Rather, Plaintiffs need only establish a reasonable inference that Tennessee law would discourage individuals from migrating. *Shapiro*, 394 U.S. at 629.

It seems unlikely that in post-Civil War history states have imposed any more drastic penalty on the exercise of the right to travel than a state-decreed nullification of a person's marital status. Moreover, the penalty that Tennessee law imposes lasts for as long as Plaintiffs reside in the state, rendering the penalty more extreme even in duration than burdens that the Supreme Court has found unconstitutional in other right-to-travel cases. *See, e.g., Saenz*, 526 U.S. 489 (invalidating state's attempt to limit new residents, for the first year they live in California, to benefits they would have received in their prior state); *Shapiro*, 394 U.S. at 634 (invalidating a one-year waiting period for state welfare benefits); *Maricopa County*, 415 U.S. at 269-70 (invalidating state's one year residency requirement as condition for indigent citizens to receive free nonemergency medical care).

Because Tennessee law severely penalizes Plaintiffs for exercising their right to travel, and because the penalty affects sufficiently important rights, the state must justify the law with "a compelling state interest." *Maricopa County*, 415 U.S. at 258; *see also Shapiro*, 394 U.S. at 634. For all of the reasons discussed in the prior section, Tennessee cannot offer a compelling interest to justify its refusal to recognize Plaintiffs' validly celebrated marriages.

A ruling in Plaintiffs' favor on their right-to-travel claim is consistent with, and will not diminish, Tennessee's broad authority to regulate marriage, including its authority to refuse to recognize some marriages celebrated in other states. Tennessee remains free to regulate which out-of-state marriages it will recognize, consistent with the basic understanding that "[s]tate laws defining and regulating marriage, of course, must respect the constitutional rights of persons." *Windsor*, 133 S.Ct. at 2691. There have been, and undoubtedly will in the future be, circumstances in which Tennessee will be able to demonstrate that its refusal to recognize certain marriages entered into elsewhere serves a sufficiently important state interest. Here, however, because the Anti-Recognition Laws violate Plaintiffs' right to interstate travel in severe and

profound ways, and because Tennessee cannot justify those laws with a compelling state interest, Plaintiffs are likely to succeed on their right-to-travel claim.

### D. The Anti-Recognition Laws Deny Plaintiffs Equal Protection of the Laws.

Tennessee's Anti-Recognition Laws create two categories of couples who married out of state: opposite-sex couples married out of state, whose marriages are almost universally recognized in Tennessee, and same-sex couples married out of state, whose marriages are categorically denied recognition. As in *Windsor*, such a categorical denial of government recognition of legally valid marriages not only deprives married same-sex couples of due process, but also denies them equal protection of the laws. *See Windsor,* 133 S. Ct. at 2695. Like the federal statute challenged in *Windsor*, Tennessee's Anti-Recognition Laws warrant "careful consideration" because they constitute discrimination of an unusual character— specifically, because they depart from Tennessee's longstanding recognition of valid marriages from other states in order to treat married same-sex couples unequally. For the same reasons described above, the Anti-Recognition Laws cannot meet that test; indeed, they cannot survive even rational basis review.

In *Windsor*, the Supreme Court held that DOMA could not withstand careful consideration and in fact failed to advance any legitimate goal; accordingly, the Court did not consider whether laws that discriminate based on sexual orientation are subject to heightened scrutiny. Nor did the Court in *Windsor* determine whether laws that discriminate against same-sex couples constitute discrimination based on gender, which is subject to heightened scrutiny under established law. *See United States v. Virginia*, 518 U.S. 515 (1996). This Court likewise need not reach those issues to conclude that Tennessee's Anti-Recognition Laws cannot survive careful consideration or any level of constitutional review. But should this Court reach these questions, the factors that the Supreme Court has considered to determine whether discrimination

on a particular basis warrants heightened scrutiny compel the conclusion that government discrimination based on sexual orientation warrants heightened review. In addition, laws that discriminate against same-sex couples also warrant heightened scrutiny because they discriminate based on gender.

1. **The Anti-Recognition Laws discriminate against the class of legally married same-sex couples and therefore are subject at least to the careful consideration applied by the Supreme Court in *Windsor*.**

Like DOMA, Tennessee's Anti-Recognition Laws facially target the class of married same-sex couples. *See Windsor,* 133 S. Ct. at 2695 ("The class to which DOMA directs its restrictions and restraints are those persons who are joined in same-sex marriages."). In *Windsor*, the Supreme Court held that DOMA's targeting of that class required "careful consideration" under both due process and equal protection review for two reasons: first, because the statute departed from the federal government's longstanding practice of deferring to the states to determine marital status; and second, because it did so in order to subject a particular group of married couples to unequal treatment. *See id.* at 2694 (holding that DOMA's "principal effect is to identify a subset of state-sanctioned marriage and make them unequal").

The same equal protection analysis applies here. As explained in Section I.A, Tennessee's Anti-Recognition Laws constitute "discriminations of an unusual character." *Id.* at 2692 (internal citations and quotation marks excluded). And like DOMA, the Anti-Recognition Laws were not enacted for any reason independent of or unrelated to excluding married same-sex couples from recognition, but to achieve that very result. "The principal purpose is to impose inequality[.]" *Id.* at 2694. As the Supreme Court held in *Windsor*, such a law fails the requirement of equal protection in the most basic way. *Id.* at 2693.

### 2. The Anti-Recognition Laws discriminate on the basis of sexual orientation and therefore are subject to heightened scrutiny.

Because the Anti-Recognition Laws target same-sex couples, and only those couples, for denial of recognition of their otherwise valid out-of-state marriages, these laws, on their face, discriminate against gay, lesbian, and bisexual people on the basis of their sexual orientation. *See, e.g., Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012) (analyzing DOMA as discriminating against gay and lesbian people); *Massachusetts v. United States Dep't of Health & Human Servs.*, 682 F.3d 1, 11 (1st Cir. 2012) (same). In *Windsor,* the Supreme Court noted that whether "heightened equal protection scrutiny should apply to laws that classify on the basis of sexual orientation" is an issue "still being debated and considered in the courts." 133 S. Ct. at 2683-84. In affirming the judgment of the Second Circuit in that case, the Court left undisturbed the Second Circuit's holding that laws that discriminate based on sexual orientation should be scrutinized under the same heightened standard that the Supreme Court has applied to gender-based classifications. *See Windsor,* 699 F.3d at 185. The Supreme Court did not reverse or question the Second Circuit's application of heightened scrutiny, but as described above, held that Section 3 of DOMA violated the requirement of equal protection in a more basic way, because its purpose and effect were to subject married same-sex couples to unequal treatment. 133 S. Ct. at 2692.

Relying upon *Bowers v. Hardwick*, 478 U.S. 186 (1986), the Sixth Circuit has held in cases prior to *Windsor* that discrimination based on sexual orientation is subject only to rational basis review, based upon the erroneous premise that such discrimination targets constitutionally proscribable conduct. *See, e.g.*, *Equality Found. of Greater Cincinnati, Inc. v. City of Cincinnati*, 128 F.3d 289, 292-93 (6th Cir. 1997) ("*Equality Foundation II*"); *Scarbrough v. Morgan Cnty. Bd. of Educ.,* 470 F.3d 250, 261 (6th Cir. 2006) (relying on *Equality Foundation II*). In

*Lawrence v. Texas*, however, the Supreme Court held that "*Bowers* was not correct when it was decided, and it is not correct today." *Lawrence,* 539 U.S. at 578. The Supreme Court's decision in *Lawrence* eliminates the rationales and authority upon which the Sixth Circuit relied in holding that laws targeting gay persons are subject only to rational basis review. Moreover, the Supreme Court in *Windsor* gave "careful consideration" to Section 3 of DOMA, rather than simply applying rational basis review. *Windsor,* 133 S. Ct. at 2692. The Sixth Circuit has explained that, when Sixth Circuit precedent is "irreconcilable" with later Supreme Court precedent, the older Sixth Circuit precedent no longer should be followed. *See Sierra Club v. Korleski*, 681 F.3d 342, 352 (6th Cir. 2012); *see also Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (instructing in "cases of . . . clear irreconcilability [between circuit precedent and intervening Supreme Court authority], a three judge panel of [the circuit] and district courts should consider themselves bound by the intervening higher authority and reject the prior opinion of [the circuit] as having been effectively overruled."). Sixth Circuit precedents calling for rational basis review of laws that discriminate based on sexual orientation were expressly based on *Bowers,* are therefore irreconcilable with *Lawrence,* and are further irreconcilable with the Supreme Court's application of a more careful level of review in *Windsor*. This Court is no longer bound by Sixth Circuit decisions stating that only rational basis review applies to laws that discriminate based on sexual orientation.

Instead, based on considerations that the Supreme Court has historically employed in determining whether a particular statute employs a suspect or quasi-suspect classification, this Court should apply heightened scrutiny to Tennessee's Anti-Recognition Laws. Factors that the Supreme Court and other courts have used to determine whether a classification warrants heightened scrutiny under the Equal Protection Clause include: whether the group targeted by the law has suffered a history of invidious discrimination, *see Mass. Bd. of Ret. v. Murgia*, 427 U.S.

307, 313 (1976); and whether the characteristic defining the group bears no relation "to the ability to perform or contribute to society." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). If a classified group has suffered a history of discrimination based on a characteristic that has no bearing on their ability to perform or contribute to society, it is very likely that the classification "provides no sensible ground for differential treatment." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985); *see Murgia*, 427 U.S. at 313 (holding heightened scrutiny is appropriate when members of a group have "been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities"). As additional—but not dispositive—factors, courts have sometimes considered the group's minority status or relative lack of political power, *see Plyler v. Doe*, 457 U.S. 202, 216 n.14 (1985); *Lyng v. Castillo*, 477 U.S. 635, 638 (1986) ("minority *or* politically powerless") (emphasis added), and whether the characteristic defining the group is immutable or an integral part of a person's identity, *see Bowen v. Gilliard*, 483 U.S. 587, 602 (1987). Burdens imposed based on sexual orientation meet all four criteria since gay, lesbian, and bisexual people have experienced a long history of discrimination,[10] sexual orientation does not bear any relationship to a person's ability to perform in or contribute to society,[11] gay, lesbian, and bisexual people face significant obstacles achieving protection through the legislative process,[12] and sexual orientation and sexual identity

---

[10]    *See, e.g., Windsor*, 699 F.3d at 182 ("It is easy to conclude that homosexuals have suffered a history of discrimination. . . . [W]e think it is not much in debate. Perhaps the most telling proof of animus and discrimination against homosexuals in this country is that, for many years and in many states, homosexual conduct was criminal. These laws had the imprimatur of the Supreme Court."); *Golinski v. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 985-86 (N.D. Cal. 2012); *Perry v. Schwarzenegger*, 704 F.Supp.2d 921, 981-91, 997 (N.D. Cal. 2010).

[11]    *See, e.g., Windsor*, 699 F.3d at 182; *Watkins v. U.S. Army*, 875 F.2d 699, 725 (9th Cir. 1989) (Norris, J., concurring in the judgment); *Perry*, 704 F. Supp. 2d at 1002; *Kerrigan v. Comm'r of Pub. Health,* 957 A.2d 407, 435 (Conn. 2008); *Varnum v. Brien*, 763 N.W.2d 862, 890 (Iowa 2009); *Dean v. District of Columbia*, 653 A.2d 307, 345 (D.C. 1995).

[12]    Recent history has shown that gay, lesbian, and bisexual persons remain deeply vulnerable in the majoritarian political arena and are unable to rely on the traditional legislative processes to protect them from invidious discrimination. *See Windsor*, 699 F.3d at 184-85; *Perry*, 704 F. Supp. 2d at 986-88. There is no federal

are so fundamental to one's identity that a "person should not be required to abandon them to avoid discrimination."[13]

Under heightened scrutiny, Defendants bear the burden of proving the Anti-Recognition Laws' constitutionality, and those laws cannot stand unless the government can present "an exceedingly persuasive justification," showing that the laws substantially further an important government interest. *Virginia*, 518 U.S. at 533; *Windsor*, 699 F.3d at 185. As shown below, the Anti-Recognition Laws cannot withstand any level of equal protection scrutiny, let alone satisfy this demanding burden.

### 3. The Anti-Recognition Laws discriminate on the basis of gender and therefore are subject to heightened scrutiny.

The Anti-Recognition Laws also discriminate against Plaintiffs on the basis of their gender. These laws classify Plaintiffs based on their gender because the male Plaintiffs would be recognized as spouses if their partners were female, and the female Plaintiffs would be recognized as spouses if their partners were male. *See Perry,* 704 F.Supp.2d at 996; *In re Levenson*, 560 F.3d 1145, 1147 (9th Cir. 2009) (EDR Plan administrative decision). The Equal Protection Clause prohibits such "differential treatment or denial of opportunity" based on a person's gender in the absence of an "exceedingly persuasive" justification. *Virginia,* 518 U.S. at 532-33 (internal quotation marks omitted). Defendants cannot muster even a minimally plausible—let alone, an "exceedingly persuasive"—justification for employing these gender-based distinctions to deny recognition to the lawful marriages of same-sex couples.

---

legislation, and no Tennessee law, expressly prohibiting discrimination on the basis of sexual orientation in employment, education, access to public accommodations, or housing. And even when gay people have secured some protections in state courts and legislatures, opponents aggressively have used state ballot initiative and referendum processes to repeal laws or even amend state constitutions, as Tennessee has done. *See also* Tenn. Code. Ann. § 7-51-1802 (prohibiting local governments from enacting ordinances to protect individuals against discrimination on the basis of sexual orientation, and repealing any such local ordinances previously enacted).

[13]    *See, e.g., Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000), *overruled in part on other grounds* by *Thomas v. Gonzales*, 409 F.3d 1177 (9th Cir. 2005).

Defendants will likely argue that the Anti-Recognition Laws do not discriminate based on gender because they apply equally to men marrying men and women marrying women. A similar argument was made and rejected in *Loving v. Virginia,* where the state argued that its anti-miscegenation laws passed constitutional muster because they "punish equally both the white and the Negro participants in an interracial marriage." *Loving v. Virginia*, 388 U.S. 1, 8 (1967). There is no principled basis to apply a different analysis to the gender-based restriction at issue here. A law that treats same-sex couples differently than it treats opposite-sex couples is no more gender-neutral than a law that treats two persons of the same race differently than it treats two persons of different races is race-neutral. In either case, the law uses a suspect classification as the basis for differential treatment, and that differential treatment is properly subject to heightened review.

Tennessee's Anti-Recognition Laws also discriminate based on gender because they are rooted in, and perpetuate, impermissible gender stereotypes about the proper roles of men and women. In a long line of cases, the Supreme Court has held that the government may not enforce gender-specific rules based on stereotypes about roles that women and men perform within the family, whether as caregivers, breadwinners, heads of households, or parents. *See, e.g.*, *Califano v. Westcott*, 443 U.S. 76, 89 (1979) (finding unconstitutional federal statute providing for support in event of father's unemployment, but not mother's unemployment; describing measure as based on stereotypes that father is principal provider "while the mother is the 'center of home and family life'"); *Orr v. Orr*, 440 U.S. 268, 283 (1979) (invalidating measure imposing alimony obligations on husbands, but not on wives, because it "carries with it the baggage of sexual stereotypes"); *Stanton v. Stanton*, 421 U.S. 7, 14-15 (1975) (finding unconstitutional state support statute assigning different age of majority to girls than to boys and

stating, "[n]o longer is the female destined solely for the home and the rearing of the family, and only the male for the marketplace and the world of ideas").

For the same reasons, Tennessee's Anti-Recognition Laws impermissibly discriminate based on gender because they seek to compel individuals to conform to the gender-based expectation and stereotype that a person's most intimate relationship and marriage should be with a person of the opposite sex.  Tennessee's Anti-Recognition Laws impermissibly reflect those gender-based expectations and penalize individuals who depart from them, thereby limiting their ability to make fundamental decisions about how to live their lives.  By enforcing "assumptions about the proper roles of men and women," the Anti-Recognition Laws deprive individuals of their essential liberty to depart from gender-based expectations.  *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 726 (1982).

**4. Regardless of the applicable level of scrutiny, there is no constitutionally sufficient justification for the Anti-Recognition Laws' discrimination against married same-sex couples.**

As demonstrated above, there is no legitimate government purpose served by Tennessee's categorical denial of recognition to the out-of-state marriages of same-sex couples.  Tennessee recognizes the out-of-state marriages of opposite-sex couples similarly situated to the Plaintiffs, yet it treats Plaintiffs' marriages as a legal nullity solely because they are same-sex couples.  In *Windsor*, the Court reaffirmed its prior holding in *U.S. Department of Agriculture v. Moreno*, 413 U.S. 528 (1973), that a bare legislative desire to harm a politically unpopular group of people can never justify disparate treatment of that group.  *Windsor,* 133 S.Ct. at 2693. Tennessee's interest in treating same-sex married couples differently from opposite-sex married couples is precisely the same improper purpose that the Supreme Court rejected in *Windsor*:  "to impose inequality."  *Id.* at 2694; *see also Stemler v. City of Florence*, 126 F.3d  856 (6th Cir. 1997) (holding that state actions based on a desire to harm gay people violate equal protection).

Indeed, one federal court in this Circuit has already ruled in granting injunctive relief that an anti-recognition statute similar to Tennessee's has all the hallmarks of an unconstitutional scheme in light of *Windsor*.  In *Obergefell v. Kasich*, the court granted a temporary restraining order after finding that the plaintiffs are likely to succeed in establishing that Ohio's denial of recognition to the out-of-state marriages of same-sex couples violates the federal guarantee of equal protection by "treating lawful same sex marriages differently than it treats lawful opposite sex marriages."  No. 1:13-CV-501, 2013 WL 3814262, at *1 (S.D. Ohio July 22, 2013).

Like DOMA and the statutory scheme in Ohio, Tennessee's Anti-Recognition Laws violate the Equal Protection Clause because the State has no legitimate interest in treating the marriages of same-sex couples as inferior to or less respected than the marriages of opposite-sex couples, or in denying the many protections, benefits, and responsibilities of marriage to same-sex couples.  The purpose and effect of the Anti-Recognition Laws are to single out an unpopular group and cause its members harm.  Such laws cannot survive equal protection review under any level of scrutiny, let alone under the "careful consideration" the Supreme Court applied in *Windsor* or under the heightened scrutiny required for laws that discriminate on the basis of gender and sexual orientation.

## II.  PLAINTIFFS ARE SUFFERING AND WILL CONTINUE TO SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION

Because Plaintiffs have shown that they are likely to succeed on their claims that Tennessee's Anti-Recognition Laws are unconstitutional, the remaining three preliminary injunction factors weigh in favor of relief here because (1)  a violation of constitutional rights necessarily constitutes irreparable harm, (2) there is no valid governmental interest in enforcing an unconstitutional law, and (3) the public is "certainly interested" in preventing enforcement of

unconstitutional laws.  *Planned Parenthood Ass'n of Cincinnati v. City of Cincinnati,* 822 F.2d 1390, 1400 (6th Cir. 1987).

Plaintiffs are irreparably harmed each day that the Anti-Recognition Laws remain in force and continue to deprive them of their constitutional rights.  The loss of constitutional rights, "even [for] minimal periods of time, unquestionably constitute[s] irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (addressing rights under the First Amendment); *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) ("[W]hen reviewing a motion for preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated."); *see also G & V Lounge, Inc. v. Mich. Liquor Control Comm'n,* 23 F.3d 1071, 1079 (6th Cir. 1994) ("[V]iolations of [F]irst [A]mendment rights constitute per se irreparable injury."); *Planned Parenthood Ass'n of Cincinnati,* 822 F.2d at 1400 ("a violation of constitutional rights" constitutes irreparable injury); *Newsom v. Norris,* 888 F.2d 371, 378 (6th Cir. 1989); *Ramirez v. Webb*, 835 F.2d 1153, 1158 (6th Cir. 1987) (per curiam) (finding irreparable harm where Fourth Amendment rights were at stake); *Deerfield Med. Ctr. v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir. 1981) (holding that if the constitutional right of privacy is either threatened or impaired, this mandates a finding of irreparable injury).

In addition to the deprivations of constitutional rights that are sufficient to satisfy the irreparable harm prong on their own, Plaintiffs are also suffering severe dignitary and practical harms that, if allowed to continue, can never be redressed by money damages or a subsequent court order.  Marriage plays a unique and central social, legal, and economic role in American society; it reflects the commitment that a couple makes to one another, and is a public acknowledgement of the value, legitimacy, depth, and permanence of the married couple's relationship.  Conversely, denial to some couples of the status of being married in the eyes of the state communicates that the couple's private relationship is of lesser value and unworthy of legal

recognition and support. This governmental rejection of Plaintiffs' most significant relationship damages them and their children and invites public and private discrimination by marking their relationships and families as inferior to those of other married couples. *See Windsor*, 133 S. Ct. at 2694 (citing *Lawrence,* 539 U.S. 558). Particularly for those Plaintiffs raising children, Tennessee's Anti-Recognition Laws create irreparable harm by instructing those children, during their vulnerable developing years, that the marriage of their parents is unworthy of respect in the eyes of the state and need not be respected by private parties. A child has only one childhood, and the damaging effects of the state's official denigration of Plaintiffs' families can never be repaired once inflicted.

Plaintiffs are also denied the array of state-law protections intended to safeguard married couples and their families. For example, Plaintiffs Dr. Tanco and Dr. Jesty additionally face irreparable harm if their valid New York marriage is not recognized before the birth of their child in early 2014. *See* Complaint at ¶ 35; Tanco & Jesty Decls. ¶¶ 15-17. Unless the Court enjoins enforcement of the Anti-Recognition Laws, only Dr. Tanco will be recognized as a legal parent of the child at birth. Dr. Jesty will not automatically be presumed to be a legal parent, as is the case with married couples, and may be prevented from making critical healthcare decisions on the child's behalf if Dr. Tanco is unable to do so.

Given such pressing issues and the importance of the constitutional interests involved, it is not tenable for Plaintiffs and their children to wait for a potentially lengthy litigation and appellate process to obtain the critical security and protection to which they are entitled. No relief at the end of years-long litigation could make Plaintiffs or their children whole for the harm caused by their exclusion from the most "intimate" and "sacred" of life's relationships. *Zablocki*, 434 U.S. at 384.

### III. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR A PRELIMINARY INJUNCTION

Finally, a preliminary injunction is appropriate because an order enjoining the enforcement of Tennessee's Anti-Recognition Laws would not burden the rights of Defendants or third parties, and would promote the unquestioned public interest in the enforcement of constitutional rights. Enforcing an unconstitutional law is not a valid state interest, and Defendants can claim no harm to the State of Tennessee from being unable to enforce such a law. *Planned Parenthood Ass'n of Cincinnati,* 822 F.2d at 1400 (where "there is a likelihood that [a law] will be found unconstitutional," it is "questionable whether the [State] has any 'valid' interest in enforcing [it]"). Moreover, requiring Tennessee to recognize the valid out-of-state marriages of same-sex couples would create no new burden on Defendants. Defendants already routinely recognize the marriages of opposite-sex couples who move to or travel to Tennessee. Any administrative burden on the State from recognizing Plaintiffs' four additional valid marriages would be negligible. Like other married couples, Plaintiffs each possess a valid government-issued marriage certificate that may be presented whenever Tennessee requires verification of marital status.

Nor will a preliminary injunction burden the rights of third parties or the public. To the contrary, a preliminary injunction would promote the public interest because "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc.,* 23 F.3d at 1079; *Planned Parenthood Ass'n of Cincinnati*, 822 F.2d at 1400; *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati,* 363 F.3d 427, 436 (6th Cir. 2004). A preliminary injunction protecting Plaintiffs' fundamental constitutional rights would advance the shared interest of all citizens in enforcing the Constitution's guarantees and reinforce this

"Nation's basic commitment . . . to foster the dignity and well-being of all persons within its borders." *Goldberg v. Kelly*, 397 U.S. 254, 264-65 (1970).

## CONCLUSION

Plaintiffs are likely to succeed on the merits of their constitutional claims and are suffering irreparable harm every day that Tennessee's Anti-Recognition Laws remain in force. The balance of equities strongly favors an injunction, and an injunction is in the public interest. Accordingly, Plaintiffs respectfully request that the Court issue a preliminary injunction barring Defendants and those under their supervision from enforcing the Anti-Recognition Laws against the four Plaintiff couples in this case while this action is pending.

Dated:  November 19, 2013

Respectfully submitted,

*/s/ Abby R. Rubenfeld*
Abby R. Rubenfeld (B.P.R. No. 6645)
RUBENFELD LAW OFFICE, PC
2409 Hillsboro Road, Suite 200
Nashville, Tennessee  37212
Tel.:  (615) 386-9077
Fax:  (615) 386-3897
arubenfeld@rubenfeldlaw.com

*/s/ Maureen T. Holland*
Maureen T. Holland (B.P.R. No. 15202)
HOLLAND AND ASSOCIATES, PLLC
1429 Madison Avenue
Memphis, Tennessee 38104-6314
Tel.: (901) 278-8120
Fax: (901) 278-8125
mtholland@aol.com
*Admitted Pro Hac Vice*

*/s/ William L. Harbison*
William L. Harbison (B.P.R. No. 7012)
Phillip F. Cramer (B.P.R. No. 20697)
J. Scott Hickman (B.P.R. No. 17407)
John L. Farringer IV (B.P.R. No. 22783)
SHERRARD & ROE, PLC
150 3rd Avenue South, Suite 1100
Nashville, Tennessee  37201
Tel.: (615) 742-4200
bharbison@sherrardroe.com
pcramer@sherrardroe.com
shickman@sherrardroe.com
jfarringer@sherrardroe.com

*/s/ Regina M. Lambert*
Regina M. Lambert (B.P.R. No. 21567)
REGINA M. LAMBERT, ESQ.
7010 Stone Mill Drive
Knoxville, Tennessee 37919
(865) 679-3483
(865) 558-8166
lambertregina@yahoo.com
*Admitted Pro Hac Vice*

*/s/ Shannon P. Minter*

Shannon P. Minter (CA Bar No. 168907)
Christopher F. Stoll (CA Bar No. 179046)
Asaf Orr (CA Bar No. 261650)
NATIONAL CENTER FOR
   LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
Tel.: (415) 392-6257
Fax: (415) 392-8442
sminter@nclrights.org
cstoll@nclrights.org
aorr@nclrights.org
*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*


## CERTIFICATE OF SERVICE

Service of the foregoing was accomplished through the Court's Electronic Filing System this 19th day of November, 2013, upon the following:

> Martha A. Campbell
> Kevin G. Steiling
> Tennessee Attorney General's Office
> General Civil Division
> Cordell Hull Building, Second Floor
> P. O. Box 20207
> Nashville, Tennessee 37214
> martha.campbell@ag.tn.gov
> kevin.steiling@ag.tn.gov
>
> *Attorneys for Defendants*

*/s/ William L. Harbison*